UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JAYLYN ROMERO and LEXUS RODRIGUEZ<br><br>Plaintiffs,<br><br>v.<br><br>FLIGHT SERVICES & SYSTEMS, INC. and FRONTIER AIRLINES,<br><br>Defendants. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COME Plaintiffs, Jaylyn Romero ("Romero") and Lexus Rodriguez ("Rodriguez") (collectively, "Plaintiffs"), by and through their undersigned counsel, and complain against Defendants, Flight Services & Systems, Inc. ("FSS") and Frontier Airlines ("Frontier Airlines") (collectively "Defendants") as follows:

INTRODUCTION

1. This case is about a concerned and careful loadmaster who was retaliated against and unlawfully terminated for reporting the unsafe and illegal loading practices of Frontier Airlines and Flight Services & Systems, Inc. This concerned and careful loadmaster sought to ensure the safety of staff and passengers travelling by Frontier Airlines.

2. This case is also about that concerned and careful loadmaster's partner who worked with him and was later terminated because of her partner's reports about the unsafe and illegal loading practices occurring at Frontier Airlines and Flight Services & Systems, Inc.

JURISDICTION AND VENUE

3. This action arises under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

1

U.S.C. §§ 2000e, *et seq.*; the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq.*, and the Whistleblower's Protection Act ("MWPA"), 26 M.R.S. § 833.

4. This action also includes a common law claim for tortious interference.

5. Defendants are an "employer" as that term is defined in the MHRA, MWPA, and Title VII.

6. The amount in controversy in this matter exceeds $75,000.

7. This Court has subject matter jurisdiction over Plaintiffs' federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

8. On or about May 11, 2022, Plaintiffs filed a Complaint of Discrimination against Defendants alleging unlawful whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

9. On or about June 21, 2023, the MHRC issued a Notice of Right to Sue with respect to Plaintiffs' state law claims.

10. On or about June 21, 2023 the EEOC issued a Notice of Right to Sue with respect to Plaintiff's federal law claims.

11. The parties to this action executed a tolling agreement which tolled all deadlines beginning August 22, 2023 and which has continued in place to the present.

12. Plaintiffs have exhausted their administrative remedies with respect to all claims set forth in this Complaint that require administrative exhaustion.

<u>JURY TRIAL REQUESTED</u>

13. Plaintiffs request a trial by jury for all claims and issues for which a jury is permitted.

## PARTIES

14. Lexus Rodriguez is a United States citizen residing in Westbrook, Maine.

15. Jaylyn Romero is a United States citizen residing in Westbrook, Maine.

16. FSS is a corporation organized under the laws of the State of Ohio with a principal place of business in the City of Cleveland, State of Ohio.

17. Frontier Airlines is a corporation organized under the laws of the State of Colorado with a principal place of business in the City of Denver, State of Colorado.

## FACTUAL ALLEGATIONS

18. Flight Services & Systems, Inc. ("FSS") is an aviation service company with at least 15 locations including one at the Portland Jetport.

19. At all material times, FSS serviced five airlines at the Portland Jetport including Frontier Airlines.

### The Illegal Termination of Lexus Rodriguez

20. Rodriguez started working for FSS as a Ramp Agent in August 2021.

21. Rodriguez was qualified for his job and performed his job duties extremely well.

22. In October 2021, FSS sent Rodriguez to Atlanta, Georgia to attend a load master course held by Frontier Airlines.

23. Rodriguez learned the importance of loading a Frontier aircraft properly taking weight and balance into account.

24. Rodriguez learned that an aircraft that is loaded outside the center of gravity or weight limits can cause loss of control of the aircraft, putting people on the aircraft and on the ground at serious risk of injury or death.

25. Rodriguez was trained that a crew was not permitted to start loading an aircraft until the load master was present with a load plan to ensure that the plane was loaded in the manner set out in the load plan.

26. Rodriguez has reasonable cause to believe that the Federal Aviation Administration ("FAA") has regulations governing how aircraft must be loaded safely to conform to federal laws and regulations.

27. Frontier Airlines's FAA approved policy requires that the load master "provide[] preliminary and final loading information to the flight crew".

28. Rodriguez heard that FSS was involved in an accident involving a misloaded aircraft before he started working there.

29. Rodriguez completed the load master training course in Atlanta and became a certified Load Master for Frontier aircraft.

30. Rodriguez was promoted to Ramp Supervisor after he returned to Maine.

31. Rodriguez took his responsibilities seriously.

32. Rodriguez voluntarily resigned in December 2021 and was rehired in January 2022.

33. Rodriguez witnessed that many members of the crew that loaded aircraft were not conscientious and would violate policies and procedures in a way that endangered themselves and others.

34. On Saturday, February 19, 2022, Rodriguez was working as the Load Master.

35. Rodriguez told coworkers not to start loading a Frontier plane until he returned.

36. Rodriguez prepared for the job by locating a safety vest and printing out the load plan for the aircraft.

37. A load plan shows many things, including the location where bags are supposed to be loaded on the plane.

38. When Rodriguez went out on the runway to supervise the loading, he discovered that multiple co-workers had already started loading the plane with baggage.

39. This practice of loading the aircraft before Rodriguez arrived with the load plan violated Frontier's FAA approved policy and was dangerous.

40. It was Rodriguez's responsibility to be present and to ensure that the bags were counted, that the aircraft was loaded in the manner set out in the load plan, and that the load was balanced.

41. Rodriguez told the training manager, Annetta Brown ("Brown"), that the plane was being loaded illegally.

42. Rodriguez told Brown that the plane needed to be offloaded and reloaded with Rodriguez present.

43. Brown told Rodriguez that the flight was running late and they did not have time to offload it.

44. Rodriguez told Brown they should not have started to load the plane without him being present.

45. Rodriguez's statements to Brown were protected activity for purposes of the MWPA.

46. Rodriguez was reporting what he reasonably believed to be a violation of law and a practice that endangered the health and safety of others.

47. Brown said words to the effect of, "If you want to f*cking offload it, you can f*cking offload it yourself. F*ck you," before walking off.

48. A few minutes later, the manager, Arev Witham ("Witham"), approached Rodriguez and asked what happened.

49. Rodriguez recounted to Witham what had happened with Brown.

50. Rodriguez's motivation for his report to Witham was to shed light on an unlawful and unsafe practice and condition and to address and eliminate the unlawful condition.

51. Rodriguez's statements to Witham were protected activity for purposes of the MWPA.

52. Rodriguez was reporting what he reasonably believed to be a violation of law and a practice that endangered the health and safety of others.

53. Witham called Brown by phone and told her to offload the plane "right now."

54. Witham's actions reflect that Rodriguez's report and request to unload and reload the plane was reasonable and appropriate.

55. Rodriguez heard Brown yelling, cursing, and threatening to quit.

56. Witham yelled back, "You're not going to f*cking quit."

57. Witham convinced Brown to return and offload the plane and reload it properly.

58. During Rodriguez's conversation with Brown, and during Witham's conversation with Brown, Rodriguez had Shaun Bowen ("Bowen") his trainer from Atlanta, on the phone with him.

59. Rodriguez asked if Bowen heard Rodriguez's conversation with Brown and Witham.

60. Bowen confirmed that he had heard the conversation with Brown and Witham.

61. Later that day, on February 19, 2022, Rodriguez was asked to meet with Witham and Brown.

62. After a few minutes Witham and Brown brought Debra Profeta ("Profeta"), a Frontier Airlines Regional Manager, into the conversation by telephone.

63. Witham, Brown, and Profeta started berating Rodriguez.

64. Rodriguez reported that employees started loading the plane without him, the responsible Load Master, being present.

65. Rodriguez reported that Brown verbally abused him when he had reported to her that the plane was being loaded unsafely and illegally.

66. Rodriguez reported that on a previous occasion, Witham had admitted to Rodriguez that she had forged Load Master signatures on documents at times when they were short staffed on load masters.

67. Rodriguez's motivation for his report to Witham and Profeta was to shed light on an unlawful and unsafe practice and condition and to address and eliminate the unlawful condition.

68. Rodriguez's statements to Witham and Profeta were protected activity for purposes of the MWPA.

69. Rodriguez was reporting what he reasonably believed to be a violation of law and a practice that endangered the health and safety of others.

70. Rodriguez asked Profeta if she agreed that the Load Master is supposed to be present when the loading of a plane begins and at all times when the plane is being loaded and is supposed to keep count, not someone else.

71. Profeta stated that she had talked with the trainer, Bowen, and confirmed that Bowen had trained Rodriguez that the load master was required to keep the count of the bags.

72. Profeta stated that subsequent to her contact with Bowen, Bowen and Profeta learned that the load master was not required by Frontier to keep the count of bags.

73. Profeta acknowledged during the call that Rodriguez had been trained by Frontier that the load master needed to be present to keep the count of bags as they were loaded.

74. Rodriguez's statements to Profeta, Brown, and Witham were protected activity for purposes of the MWPA.

75. Rodriguez was reporting what he reasonably believed to be a violation of law and a practice that endangered the health and safety of others.

76. Profeta agreed with Brown and Witham instead of Rodriguez.

77. Witham alleged that Rodriguez cussed and swore at the others during this meeting.

78. Witham's allegation that Rodriguez cussed and swore at others during this meeting is false and evidence of pretext.

79. When the meeting was over, Rodriguez called his Atlanta trainer, Bowen.

80. Rodriguez was crying and told Bowen that his managers and Profeta had said that he was wrong about the load master needing to be present when the plane is being loaded.

81. Rodriguez asked him if he was wrong.

82. Bowen said "no, absolutely not."

83. Bowen said he felt bad for Rodriguez.

84. Bowen asked Rodriguez to finish his shift.

85. Rodriguez stated he would finish his shift.

86. Rodriguez told Bowen that he felt like they were going to terminate him.

87. Rodriguez's motivation for his report to Bowen was to shed light on an unlawful and unsafe practice and condition and to address and eliminate the unlawful condition.

88. Rodriguez's statements to Bowen were protected activity for purposes of the MWPA and MHRA.

89. Rodriguez was reporting what he reasonably believed to be a violation of law and a practice that endangered the health and safety of others.

90. On the morning of Monday, February 21, 2022, at 9:24am, Rodriguez called the Frontier ASAP hotline number (888-839-4510) and spoke with Kerry [LNU] and Tyler [LNU].

91. Rodriguez told them about FSS illegally and unsafely loading a Frontier Airlines plane on February 19, 2022, and about his meeting with management.

92. Rodriguez asked them if he was wrong in telling the FSS training manager that they needed to offload the plane because a load master was not present when it was loaded.

93. Kerry and Tyler said that Rodriguez was not wrong that a load master must be present before loading begins.

94. Rodriguez's motivation for his report to Kerry and Tyler was to shed light on an unlawful and unsafe practice and condition and to address and eliminate the unlawful condition.

95. Rodriguez's statements to Kerry and Tyler were protected activity for purposes of the MWPA.

96. Rodriguez was reporting what he reasonably believed to be a violation of law and a practice that endangered the health and safety of others.

97. Kerry and Tyler told Rodriguez they would pass the information he provided along to Profeta, the Regional District Manager.

98. Rodriguez told them that he was concerned about them telling Profeta because she was at the meeting when he was told he was wrong about the load master needing to be present.

99. Kerry and Tyler told Rodriguez that they needed to follow the chain of command.

100. Kerry and Tyler told Rodriguez to contact his human resources manager if he was concerned about retaliation.

101. Rodriguez's reports to Kerry and Tyler included opposition to what he reasonably believed was retaliation and the likelihood of future retaliation against him for engaging in protected activity under the MWPA. Rodriguez's opposition was protected for purposes of 5 M.R.S. § 4633(1).

102. Upon information and belief, Frontier Airlines informed FSS about Rodriguez's reported concerns about their unsafe and illegal loading practices.

103. Frontier Airlines's reports to FSS constituted protected activity on Rodriguez's behalf for purposes of the MWPA and MHRA.

104. In response to Plaintiffs' complaint filed with the U.S. Department of Labor, FSS's now Director of Operations, Witham, submitted an affidavit in response to Plaintiffs' complaint.

105. In that affidavit, Witham indicated that there was not a plan to terminate Rodriguez in connection with the events of February 19, 2022 and that rather the decision to terminate Rodriguez was not made until after Profeta made negative comments about Rodriguez to Witham on February 20, 2022. Witham stated in her affidavit that: "The next day [February 20, 2022], however, Ms. Profeta called me and stated that Lexus Rodriguez was reaching out to everyone at Frontier, accusing FSS of not following procedures – even though he had been

informed by Frontier that he was incorrect. He was also telling them he was concerned for his and Jaylyn's safety and that FSS was harassing them. None of this was true."

106. Witham's statement reflects that Frontier Airlines's employee, Ms. Profeta, aided, abetted, coerced, and encouraged FSS to terminate Rodriguez in retaliation for his protected reports.

107. Witham's statement reflects that Frontier Airlines's employee, Ms. Profeta, proximately caused Rodriguez's termination.

108. Witham's statement reflects that Frontier Airlines violated the MHRA. 5 M.R.S. §4553(10)(D) & §4633. In particular, Witham's statement reflects that Frontier's employee, Profeta, discriminated against Rodriguez because he opposed an act or practice that is unlawful under this Act and coerced, intimidated, and interfered with Rodriguez because he exercised and enjoyed rights protected by the MHRA.

109. Witham's statement also reflects that Frontier Airlines intentionally and tortuously interfered with Rodriguez's employment relationship with FSS.

110. Frontier Airlines's response to Plaintiffs' Charge of Discrimination filed with the Maine Human Rights Commission stated that Witham called Profeta and informed her that FSS would be terminating Rodriguez's employment.

111. Profeta agreed with FSS terminating Rodriguez's employment.

112. At 3:10pm, a few hours after he called Frontier Airlines, Witham texted Rodriguez and terminated his employment. Witham's text was a group text that included Rodriguez, Witham, Romero, and FSS Senior Director of Safety, Phil Armstrong ("Armstrong")

113. Witham wrote: "Good afternoon, Effective immediately you are no longer employed by FSS. Please return your SIDA badges to OPS center ASAP. If you have any questions please contact HR."

114. Witham terminated Rodriguez and Romero in the same text.

115. Frontier Airlines aided, abetted, coerced and encouraged the illegal termination of Rodriguez by providing input as to whether Rodriguez should be terminated and false information to support the termination.

116. FSS acted on information provided by Frontier Airlines in deciding to terminate Rodriguez's employment.

117. Reasons provided by FSS, including allegations that Rodriguez acted "angry" and "violent" during the course of his employment and that on February 19, 2022, he was "extremely aggressive", "shouting", and "cursing", and that Rodriguez was "shouting and swearing" at Profeta were false. FSS also claimed that Rodriguez was "telling FSS' ramp crew, most of whom were new hires, not to do their jobs well [] not to follow the General Manager's instructions [and] t[elling] new hires not to take a required driving test".

118. FSS's stated reasons for Rodriguez's termination are false and reflect that FSS has provided pretextual reasons and dissembled the facts to cover up the retaliatory motives for Rodriguez's termination.

<u>The Illegal Termination of Jaylyn Romero</u>

119. Romero is female.

120. Romero started working for FSS as a Ticket Agent in August 2021.

121. Romero voluntarily resigned in December 2021.

122. Romero was rehired in January 2022.

123. Romero was qualified for her job and performed her job duties satisfactorily.

124. Romero's partner, Rodriguez, worked for FSS as a Ramp Agent/Supervisor.

125. On February 19 and 21, 2022, Rodriguez engaged in protected activity under the MWPA.

126. At 3:10pm on February 21, 2022, FSS manager, Witham, texted Romero in the same group text that included Rodriguez and Armstrong and terminated her employment.

127. In that text message, Witham wrote: "Good afternoon, Effective immediately you are no longer employed by FSS. Please return your SIDA badges to OPS center ASAP. If you have any questions please contact HR."

128. During the proceedings under the Occupational Safety and Health Act, enforced through the United States Department of Labor, Witham submitted an affidavit in support of FSS's position.

129. In that affidavit, Witham described Rodriguez's conduct.

130. At the end of that affidavit, Witham testified, "After discussion with FSS management, I terminated Rodriguez and Romero due to the above conduct."

131. Witham's testimony is an admission that FSS terminated Romero for the alleged conduct of Rodriguez.

132. During the proceedings at the Maine Human Rights Commission ("MHRC"), Witham stated to the effect that she did not know the reason for Romero's termination, but that the Senior Director of Safety, Phil Armstrong ("Armstrong"), told her to terminate Romero.

133. Armstrong submitted a statement to the MHRC.

134. In Armstrong's statement to the MHRC, he described Romero's prior employment with FSS before FSS rehired her.

135. In Armstrong's statement to the MHRC, he described that Rodriguez had resigned from his position in December 2021and that, "After Mr. Rodriguez quit, Ms. Romero failed to appear at her next scheduled shifts. Ms. Witham called Ms. Romero by telephone about her absence. Ms. Romero laughed and stated that she had already turned in her badge and was quitting."

136. In Armstrong's statement to the MHRC, in reference to Romero's termination after her rehire, he stated: "FSS determined at that point that it no longer wished to continue Ms. Romero's at-will employment. While I do not specifically recall advising Arev Witham to terminate Ms. Romero, I believe it was based on Romero's own unpredictable track record at work and *the likelihood that she would once again abandon her employment*. Ms. Romero was not terminated based on her association with Mr. Rodriguez, and Mr. Rodriguez' (sic) workplace conduct did not factor into Ms. Romero's termination." (*Emphasis* added).

137. Armstrong's reason for termination that "the likelihood that she would once again abandon her employment" is an admission that FSS's termination of Rodriguez was a reason for Romero's termination because Romero resigned during her first employment with FSS after Rodriguez resigned so the only plausible reason there was a "likelihood" that Romero would allegedly "once again abandon her employment" was because Rodriguez was no longer employed with FSS.

138. Consequently, FSS terminated Romero's employment because of her association with Rodriguez.

139. Romero is an aggrieved person because she was terminated because of her association with Rodriguez, a whistleblower. Romero is within the zone of interests sought to be protected by the MHRA and Title VII.

140. Causing injury to Romero by terminating her employment was FSS's intended means of harming Rodriguez.

141. FSS fired Romero because of sex discrimination, that is, a sexist stereotype that a female partner will always support her male partner's actions, or, that a female partner has the ability and obligation to control her male partner.

142. Upon information and belief, Frontier Airlines aided and abetted FSS in the illegal termination of Romero.

## COUNT I - MHRA Retaliation

143. Paragraphs 1 – 142 are incorporated by reference.

144. The Maine Whistleblowers' Protection Act ("MWPA") prohibits an employer from discharging an employee because: "the employee acting in good faith . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States." 26 M.R.S. § 833(1)(A).

145. The Maine Whistleblowers' Protection Act ("MWPA") also prohibits an employer from discharging an employee because: "The employee, acting in good faith, or a person acting on behalf of the employee, reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." 26 M.R.S. § 833(1)(B).

146. The MHRA prohibits an employer from discharging an employee because of previous actions that are protected under the MWPA. *See* 5 M.R.S. § 4572(1)(A).

147. Defendants violated the MWPA as enforced through the MHRA when they terminated the Plaintiffs for engaging in activity protected by the MWPA.

148. Defendant Frontier Airlines aided, abetted, incited, compelled and coerced FSS to terminate Plaintiffs from their positions with FSS in violation of 5 M.R.S. § 4553(10).

149. Defendant Frontier Airlines unlawfully coerced, intimidated, threatened, and interfered with Plaintiffs' exercise and enjoyment of their right to be free from retaliation in violation of 5 M.R.S. § 4633(2).

150. As a result of Defendants' unlawful conduct, Plaintiffs have suffered damages in an amount to be determined at trial, including but not limited to backpay, compensatory damages, punitive damages, attorneys' fees, and all other damages recoverable at law and in equity.

151. Defendants' conduct as described in Paragraphs 1 – 142 violates the MHRA and MWPA.

### COUNT II – Title VII – Sex Discrimination

152. Paragraphs 1 - 151 are incorporated by reference.

153. Title VII makes it unlawful for an "employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's… sex." 42 U.S. Code § 2000e–2.

154. Defendants' conduct as described in Paragraphs 1 – 142 violates Title VII.

### COUNT III – MHRA – Sex Discrimination

155. Paragraphs 1 – 154 are incorporated by reference.

156. The MHRA makes it "unlawful…[f]or any employer…because of…sex…to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or

indirectly related to employment; or, in recruiting of individuals for employment or in hiring them, to utilize any employment agency that the employer knows or has reasonable cause to know discriminates against individuals because of their race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status…" 5 M.R.S. § 4572(1).

157. Defendants' conduct described in Paragraphs 1 – 142 violates the MHRA.

## COUNT IV: TORTIOUS INTERFERENCE

158. Paragraphs 1-157 are incorporated by reference.

159. Valid contracts and or advantageous economic relationships existed between Plaintiff Rodriguez and Defendant FSS.

160. Defendant Frontier Airlines was aware of the contract/relationship and interfered with it with the intention of interference with and ending the contract/relationship.

161. Defendant Frontier Airlines' interference with Plaintiff Rodriguez's contract/relationship proximately caused damages to Plaintiffs.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A. Declare the conduct engaged in by Defendants to be in violation of their rights;

B. Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate their rights;

C. Order Defendant FSS to reinstate Plaintiffs or award front pay to Plaintiffs;

D. Award lost future earnings to compensate Plaintiffs for the diminution in expected earnings caused by Defendants' discrimination.

E. Award equitable-relief for back pay, benefits and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award nominal damages;

I. Award attorneys' fees, including legal expenses, and costs;

J. Award prejudgment interest;

K. Permanently enjoin Defendants from engaging in any unlawful employment practices;

L. Require Defendants to mail a letter to all employees notifying them of the verdict against Defendants and stating that Defendants will not tolerate discrimination in the future;

M. Require that Defendants post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N. Require that Defendants train all management level employees on the protections afforded by the MHRA, Title VII, and the MWPA;

O. Require that Defendants place a document in Plaintiffs' personnel files which explains that Defendants were unlawfully terminated because of retaliation; and

P. Grant to Plaintiffs such other and further relief as may be just and proper.

Dated: November 6, 2023

/s/ Chad T. Hansen
Chad T. Hansen

/s/ Martin P. Tartre
Martin P. Tartre
Attorneys for Plaintiffs

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101

                Tel. (207) 874-0905
                Fax (207) 874-0343
                Chad@EmployeeRightsLaw.Attorney
                Martin@EmployeeRightsLaw.Attorney